## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Randy E. Smale, | ) | Case No. 07-11396 (CSS) |
| | ) | Reference Docket No. 13 |
| Debtor. | ) | |
| | ) | |

### OPINION[1]

| | |
|---|---|
| Roberta A. DeAngelis | Steven J. Stirparo |
| William K. Harrington | 3622 Silverside Road |
| Office of the United States Trustee | Wilmington, DE  19810 |
| 844 King Street, Suite 2207 | |
| Wilmington, DE  19801 | Counsel For Debtor |

Acting United States Trustee[2]

Dated: June 9, 2008

Sontchi, J. _____

Before the Court is the Motion of the United States Trustee to Dismiss Case Pursuant To 11 U.S.C. § 707(b)(2) Or, Alternatively, Pursuant To 11 U.S.C. § 707(b)(3) [D.I. 13] (the "Motion to Dismiss"). The United States Trustee argues that a presumption of abuse arises under section 707(b)(2) of the Bankruptcy Code that has not been rebutted by the debtor because if one gives effect to the debtor's declared intention to surrender three of his four vehicles his monthly

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] Ms. DeAngelis was appointed Acting United States Trustee for an interim period, effective May 2, 2008.  As briefing and argument in this matter occurred prior to Ms. DeAngelis's appointment, all references in this opinion are to the United States Trustee.

disposable income will be higher than allowed under the means test established by section 707(b)(2) of the Bankruptcy Code. For the reasons set forth below, the Court will deny the Motion to Dismiss.

## Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. § 1334. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a). This is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (O).

## Procedural and Factual Background

On September 27, 2007 (the Petition Date"), the debtor filed a voluntary chapter 7 petition. On Form B22, which was filed on the Petition Date, the debtor listed personal property that included four vehicles. The debtor specified that secured claims were held on all four of the vehicles and that he intended to surrender three of the vehicles and claim one remaining vehicle as exempt property. In Subpart C of Form B22, the debtor listed deductions for debt payments, including payments on loans for all four of the vehicles.

According to the debtor's calculations, which include deductions for payments on the three vehicles that the debtor intends to surrender, he has no disposable income. The debtor concedes, however, that if he is not permitted to claim the deductions for payments on the three vehicles that the debtor intends to surrender, his disposable income would trigger the presumption of abuse under 11 U.S.C. § 707(b)(2) and his case would have to be dismissed or voluntarily converted to a case under Chapter 13 of the Bankruptcy Code.

The Court held a hearing on the Motion to Dismiss on January 9, 2008. On May 22, 2008, the Court issued a letter opinion and entered an order granting the Motion to Dismiss [Docket Nos. 33 and 34]. The Court based its ruling upon the United States Trustee's argument in the Motion to Dismiss that the "totality of the circumstances" requires dismissal of the debtor's case under section 707(b)(3) of the Bankruptcy Code because, if one gives effect to the debtor's declared intention to surrender three of his four vehicles, the debtor has the ability to fund a chapter 13 plan out of future disposable income. At the hearing on the Motion to Dismiss, however, the United States Trustee expressly limited her argument to the issue under section 707(b)(2). Moreover, the debtor has amended his schedules upon which the Court based its finding that the debtor has the ability to fund a Chapter 13 plan. Thus, the Court subsequently granted the debtor's Motion for Reconsideration and/or Rehearing [Docket No. 35] and entered an order vacating it May 22, 2008 letter opinion and order [Docket No. 36]. This matter is now ripe for decision.

**Legal Discussion**

    1.    **Statutory Interpretation**

"[C]ontemporary Supreme Court jurisprudence establishes that the purpose of statutory interpretation is to determine congressional intent."[3] To that end,

---

[3] Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR. L.J.195, 211 (2007).

the starting point is to examine the plain meaning of the text of the statute.[4]  As the Supreme Court recently observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, "when a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms."[5]  Additionally, the Supreme Court has repeatedly stated that "[t]he United States Congress says in a statute what it means and means in a statute what it says there."[6]

Notwithstanding the foregoing, applying the plain meaning of the statute is the default entrance – not the mandatory exit.[7]  If the statute is ambiguous, the Court must use other canons of statutory construction, including legislative history where available, to determine the purpose of the statute.[8]  Moreover, regardless of whether the Court's interpretation of the statute's purpose is based

---

[4] *Id.* at 229 ("Statutory analysis . . . must start with the text at issue to determine if its meaning can be understood from the text."). *See also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.").

[5] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000).  *See also United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.").

[6] *Hartford Underwriters Ins. Co.*, 530 U.S. at 6 (quoting *Connecticut Nat. Bank,* 503 U.S. at 254).

[7] Waldron and Berman, *supra* n. 3, at 232.

[8] *See Price v. Delaware State Police Fed. Union (In re Price)*, 370 F.3d 362, 369 (3d Cir. 2004) ("Thus, ambiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error.  Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous.  Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive. In such situations of unclarity, 'where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived,' including pre-Code practice, policy, and legislative history.") (internal citations omitted).

upon the plain meaning of the text or the application of canons of statutory construction to determine the meaning of ambiguous text, it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation of the text at issue.[9]

### 2. The "Means Test" Under Section 707(b)(2)

The "means test" of section 707(b)(2) determines whether there is a presumption of abuse by application of a formula that calculates disposable income by deducting a list of permitted expenses from a figure calculated by averaging the debtor's income for the six months prior to the petition date. Although most of the expenses in the means test are standardized, section 707(b)(2)(A)(iii) permits a deduction based on a debtor's actual payments on secured debts. This deduction is calculated as the sum of the average of:

(I)    the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II)    any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.[10]

---

[9] *Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004) ("Though we find it unnecessary to rely on the legislative history behind the 1994 enactment of § 330(a)(1), we find it instructive that the history creates more confusion than clarity about the congressional intent. History and policy considerations lend support both to petitioner's interpretation and to the holding we reach based on the plain language of the statute.").

[10] 11 U.S.C. § 707(b)(2)(A)(iii).

The debtor argues that this provision allows him to deduct the payments on the debts secured by all his vehicles, notwithstanding that he filed a Statement of Intention on the Petition Date declaring his intent to surrender three of his four vehicles. The United States Trustee, on the other hand, argues that the debtor cannot deduct payments on debts secured by property he intends to surrender.

### 3.   Split of Authority

There is a split of authority as to whether payments on property that has been or will be surrendered may be included in calculating a debtor's average monthly payments on account of secured debts under section 707(b)(2)(A)(iii)(I) of the Bankruptcy Code.[11] As ably described by Judge Venters, the vast majority of courts considering this issue have determined that, under the plain meaning of the statute, a debtor is permitted to claim a deduction for payments on debts secured by property that the debtor intends to surrender.[12]

> The majority position boils down to two essential points -- that amounts "scheduled as contractually due" in § 707(b)(2)(A)(iii)(I) refers to the amounts due as "provided for by" the underlying contract, and that the means test calculations are intended to represent a "snapshot" as of the petition date, examined without regard to a debtor's future intentions. Because an intent to surrender has no legal effect on a debt, the majority reasons, a debtor is obligated on the petition date to make the contractual payments to the creditor, and therefore may claim a means-test deduction for those payments. Many courts in the majority have acknowledged that this result may be inconsistent with the reality of the situation, but they assert that it is mandated by the plain language of the statute and is consistent with Congress's intent to

---

[11] *See In re Burden*, 380 B.R. 194, 200, n. 14 (Bankr. W.D. Mo. 2007) (collecting cases).

[12] *Id.* at 200.

6

> create in § 707(b)(2) a standardized and mechanical test that "avoid[s] reliance on individualized information as much as possible. . . "[13]

The courts in the minority on this issue also focus on the plain language of the statute.

> [T]hey assert that the term "scheduled" in § 707(b)(2)(A)(iii)(I) has a bankruptcy-specific meaning which refers to how the debt is listed in a debtor's schedules and statements. Thus, if the debtor has indicated an intent to surrender the debt on his Statement of Intention, then the debt is not "scheduled as contractually due," and the debtor cannot deduct the payment on that debt on the means test. The minority asserts that its approach better effectuates BAPCPA's goal of ensuring that those debtors who can pay their debts do so.[14]

### 4. Statute is Ambiguous

As a preliminary matter, the Court finds the phrase "scheduled as contractually due" in § 707(b)(2)(A)(iii)(I) to be ambiguous. The strained linguistic arguments of both the majority and minority camps to identify the "plain meaning" of the phrase readily identify the ambiguity. For example, the minority courts interpret the phrase "scheduled as" to refer to whether a debt is identified on a debtor's bankruptcy schedules.[15] Those courts go on, however, to hold that "the [d]ebtors' schedules *and statements* form the basis from which the Court should determine whether a debt is "scheduled as contractually due," notwithstanding that there is no mention of the debtor's statements in section

---

[13] *Id.* (internal footnotes omitted) (quoting *In re Randle*, 358 B.R. 360, 364 (Bankr. N.D. Ill. 2006)).

[14] *Id.* at 200-01 (internal footnotes omitted).

[15] *In re Skaggs,* 349 B.R. 594, 599 (Bankr. D. Mo. 2006).

7

707(b)(2)(A)(iii)(I).[16]  Moreover, the argument that "Congress used the phrase 'scheduled as' several times in the Bankruptcy Code to refer not to the common dictionary meaning for the word schedule (i.e., 'to plan for a certain date'), but to whether a debt is identified on a debtor's bankruptcy schedules"[17] has proven to be inaccurate.[18]

Similarly, the majority courts cite to the dictionary definition of "schedule" to mean "to plan for a certain date." [19]  These courts also find the common meaning of "as contractually due" to be "that the debtor is legally obligated under the contract, in this case, a promissory note, to make a payment in a certain amount, with a certain amount of interest, for a set number of months into the future."[20] Thus, the majority courts have found, under the plain meaning of section 707(b)(2)(A)(iii)(I), that:

---

[16] *Id.* (emphasis added)

[17] *Id.*

[18] *In re Nockerts*, 357 B.R. 497, 502 (Bankr. E.D. Wis. 2006) ("However, although the Bankruptcy Code uses the phrase 'scheduled as contractually due' only once (in § 707(b)(2)(A)(iii)), it also uses the phrase 'scheduled as' only one time -- in § 1111(a), which provides: 'A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated' . . . Broadening the review to include the Bankruptcy Code's references to a claim or debt being 'scheduled' turns up two provisions that obviously mean 'listed on the bankruptcy schedules': § 523(a)(3) (discharge of a debt that is 'neither listed nor scheduled under section 521(1)'); and § 554(c) (deemed abandonment of property 'scheduled under section 521(1)'), and two provisions that equally obviously do not: § 524(k)(3)(H)(ii) (suggested reaffirmation agreement language 'describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party'); and § 1326(a)(1)(B) (debtor shall make pre-confirmation payments 'scheduled in a lease of personal property directly to the lessor').").

[19] *In re Walker*, 2006 Bankr. LEXIS 845  at [*9] (Bankr. N.D. Ga. 2006).

[20] *Id.*

>in determining which payments should be averaged for the deduction, the Court should determine how many payments are owed under the contract for each secured debt at the time of filing. This interpretation gives meaning to the word "scheduled," which implies the possibility that the payments may not be made as required under the contract, either because the debtor will surrender the collateral or because the payments might be modified and paid through a Chapter 13 plan. If the intent were to permit only those payments that would actually be made in the post-petition period, Congress could have specified that the payments to be deducted are only those payments to be made on secured debts that the debtor intends to reaffirm.[21]

As noted by the court in *In re Ray*, however, the "problem with [the majority] cases is that they come to the same conclusion about the meaning of the statute as would result if the words 'scheduled as' were not present but do so by focusing on those very words."[22] In other words, "the courts construe the [plain meaning of the] statute as providing for the calculation of 'the total of all amount contractually due.'"[23]

### 5. Legislative History

As noted earlier, if a statute is ambiguous, the Court must use other canons of statutory construction, including legislative history where available, to determine the purpose of the statute.[24] Unfortunately, it is difficult to apply any overarching legislative purpose when interpreting the 2005 amendments to the Bankruptcy Code. Indeed, courts that have attempted to do so have arrived "at

---

[21] *Id.* at [*11]

[22] *In re Ray*, 362 B.R. 680, 682 (Bankr. D.S.C. 2007).

[23] *Id.* at n. 5.

[24] *See* p. 4, *supra*.

conclusions as disparate as that Congress intended to deny bankruptcy relief to as many debtors as possible, deprive judges of discretion, and clean up a fraud riddled system."[25] The difficulty in identifying an overarching purpose is not surprising given the breadth of the amendments.[26]

Similarly, the legislative history specifically applying to section 707 is not helpful in interpreting the issue before the Court. Congress amended section 707 to include "[t]he concept of needs-based bankruptcy relief."[27] This was done to address the perceived limitations on the utility of the existing standards for dismissal, i.e., "cause" or "substantial abuse."[28]

> Under current law, neither the court nor the United States trustee is required to file a motion to dismiss a chapter 7 case for substantial abuse under section 707(b). In addition, other parties in interest, such as chapter 7 trustees and creditors, are prohibited from filing such motions. In fact, section 707(b) specifies that a motion under that provision may not even be made 'at the request or suggestion of any party in interest.' The standard for dismissal substantial

---

[25] *In re Ray*, 362 B.R. at 684.

[26] H.R. Rep. 109-31(I), p. 2, 2005 U.S.C.C.A.N. 88, 89 ("[T]he 'Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,' is a comprehensive package of reform measures pertaining to both consumer and business bankruptcy cases. The purpose of the bill is to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors. With respect to the interests of creditors, the proposed reforms respond to many of the factors contributing to the increase in consumer bankruptcy filings, such as lack of personal financial accountability, the proliferation of serial filings, and the absence of effective oversight to eliminate abuse in the system. The heart of the bill's consumer bankruptcy reforms consists of the implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'), which is intended to ensure that debtors repay creditors the maximum they can afford. S. 256 also establishes new eligibility standards for consumer bankruptcy relief and includes provisions intended to deter serial and abusive bankruptcy filings. It substantially augments the responsibilities of those charged with administering consumer bankruptcy cases as well as those who counsel debtors with respect to obtaining such relief. In addition, the bill caps the amount of homestead equity a debtor may shield from creditors, under certain circumstances.") (footnote omitted).

[27] H.R. Rep. 109-31(I), p. 11, 2005 U.S.C.C.A.N. 88, 97.

[28] H.R. Rep. 109-31(I), pp. 11-12, 2005 U.S.C.C.A.N. 88, 98.

10

abuse is inherently vague, which has lead to its disparate interpretation and application by the bankruptcy bench. Some courts, for example, hold that a debtor's ability to repay a significant portion of his or her debts out of future income constitutes substantial abuse and therefore is cause for dismissal; others do not. A further reason militating against filing section 707(b) motions is that the Bankruptcy Code codifies a presumption that favors granting a debtor a discharge.[29]

None of these identified limitations are relevant to whether, in applying the means test, section 707(b)(2)(A)(iii)(I) of the Bankruptcy Code permits a debtor to claim a deduction for payments on debts secured by property that the debtor intends to surrender.

Apparently concerned with the possibly draconian effects of establishing a means test, Congress identified two "safe harbors" to the means test.

> Two types of 'safe harbors' apply to the means test. One provides that only a judge, United States trustee, bankruptcy administrator, or private trustee may file a motion to dismiss a chapter 7 case under section 707(b) of the Bankruptcy Code if the debtor's income (or in a joint case, the income of debtor and the debtor's spouse) does not exceed the state median family income for a family of equal or lesser size (adjusted for larger sized families), or the state median family income for one earner in the case of a one-person household. The second safe harbor provides that no motion under section 707(b)(2) (dismissal based on a chapter 7 debtor's ability to repay) may be filed by a judge, United States trustee, bankruptcy administrator, private trustee, or other party in interest if the debtor (including the circumstance where the debtor is a veteran) and the debtor's spouse combined have income that does not exceed the state median family income for a family of equal or lesser size (adjusted for larger sized families), or the state median family income for one earner in the case of a one-person household. In addition, the bill includes a safe harbor from the bill's needs-based test for a disabled veteran whose indebtedness occurred primarily during a period when the individual was on active duty

---

[29] H.R. Rep. 109-31(I), p. 12, 2005 U.S.C.C.A.N. 88, 98-99 (footnote omitted).

>    (as defined in 10 U.S.C. Section(s) 101(d)(1)) or performing a homeland defense activity (as defined in 32 U.S.C. Section(s) 901(1)).[30]

Again, neither of these safe harbors is relevant to the issue before the Court. Thus, the Court is left with an ambiguous statute where the overarching purpose of the stature cannot be identified by the legislative history and the portions of that history relating to the section of the statute before the Court are not relevant.

### 6.    Application of the Principle of *Noscita a Sociis*

One of the numerous canons of statutory interpretation other than plain meaning and legislative history is the principle of *noscitur a sociis*, under which the meaning of an unclear word or phrase should be determined by the words immediately surrounding it.[31]  "Of course *noscitur a sociis* is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps,' -- that is to say, which of various possible meanings a word should be given must be determined in a manner that makes it 'fit' with the words with which it is closely associated."[32] This Court recently applied the principle of *noscitur a sociis* in finding that the inclusion of certain limiting language in section 503(c)(3) of the Bankruptcy Code counseled against reading such a limitation into section 503(c)(1).[33]

---

[30] H.R. Rep. 109-31(I), p. 15, 2005 U.S.C.C.A.N. 88, 101  (footnote omitted).

[31] *James v. United States*, 127 S. Ct. 1586, 1605 (2007) (Scalia, J., dissenting).

[32] *Id.* (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S. Ct. 1579 (1961)).

[33] *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 801 (Bankr. D. Del. 2007).

In this case, the language of section 703(b)(3) informs the Court's analysis of section 703(b)(2). Judge Shannon recently analyzed the interplay between sections 702(b)(2) and (b)(3) in *In re Haman*.[34] The issue in *In re Haman* was whether a debtor could rebut the presumption of abuse under section 707(b)(2) by demonstrating that the payments due under a non-dischargeable student loan constituted a special circumstance. In rejecting an argument by the Untied States Trustee that the Court should consider in its special circumstances analysis whether a debtor could proceed in a case under chapter 13 and what possible return unsecured creditors would receive, Judge Shannon analyzed the cases discussing whether a debtor cannot deduct payments on debts secured by property he intends to surrender.[35] While carefully noting that the issue was not before the court,[36] Judge Shannon favorably cited the majority cases (which hold that the debtor may deduct the payments) because those cases allow for a "mechanical" application of the means test.[37]

This Court agrees that "[t]o allow a movant to include the outcome of future events as part of the means test would eliminate the distinction between the presumption of abuse test and the totality of the circumstances test."[38] If the means test included future circumstances it would no longer act as a mere

---

[34] *In re Haman*, 366 B.R. 307, 316-18 (Bankr. D. Del. 2007).

[35] *Id.*

[36] *Id.* at 316.

[37] *Id.* at 317 (quoting *In re Hartwick* 359 B.R. 16, 21-22 (Bankr. D.N.H. 2007)).

[38] *In re Singletary*, 354 B.R. 455, 465 (Bankr. S.D. Tex. 2006).

"mathematical estimate" using the income and expense figures provided for on Form B22 but rather would necessitate an analysis of a variety of factors, such as whether a debtor intends to surrender collateral (and the possible effects thereof), which could significantly delay administration of the case.[39]  This Court agrees with Judge Shannon that such an "analysis is more properly conducted under section 707 (b)(3)."[40]

This is consistent with Chief Judge Walrath's opinion in *In re Pennington*.[41] The issue in *In re Pennington* was whether, in considering the "totality of the circumstances . . . of the debtor's financial situation" under section 703(b)(3), the Court was limited to consideration the debtor's financial situation as of the date of the filing of the petition or may and/or must consider the debtor's financial situation at the time the motion to dismiss is heard.  In that case, the debtor's monthly car payment, as of the date of the filing of the petition, was $557.  The debtor subsequently surrendered his car and bought a less expensive model, the monthly payment on which was $272.77.  The Court held that it "must consider the debtor's financial condition at the time of the hearing on the motion to dismiss in determining whether granting chapter 7 relief is an abuse under section 707(b)(3)."[42]  In so ruling, the Court noted that the decision in *In re*

---

[39] *In re Haman*, 366 B.R. at 318.

[40] *Id*.

[41] *In re Pennington*, 348 B.R. 647 (Bankr. D. Del. 2006).

[42] *Id.* at 651.

*Walker*[43] was inapplicable because in that case the court "addressed the issue of whether car payments due at the time of filing were used for purposes of the means test under section 707(b)(2), but not for purposes of the totality of the circumstances test under section 707(b)(3)."[44]

Thus, this Court finds that the most reasonable interpretation of sections 707(b)(2) and (3), taken as a whole, is to allow the debtor to include payments on property that has been or will be surrendered under section 707(b)(2)(A)(iii) of the Bankruptcy Code.

## **Conclusion**

Based upon application of the principle of *noscitur a sociis* (as opposed to the plain meaning of the statute or its legislative history), this Court finds that payments on property that has been or will be surrendered may be included in calculating a debtor's average monthly payments on account of secured debts under section 707(b)(2)(A)(iii) of the Bankruptcy Code.  Thus, the Motion to Dismiss will be denied in part to deny the United State Trustee motion to dismiss the case under section 702(b)(2).[45]  An order will be issued.

---

[43] *In re Walker*, n. 20, *supra*.

[44] *In re Pennington*, 348 B.R. at 650.

[45] The Motion to Dismiss to dismiss the case under section 702(b)(2) is not before the Court.